AMERICAN FIBRE-CHAMOIS CO. v. BUCKSKIN-FIBRE CO. et al.

Nos. 332 and 334.

SAME v. WILLIAMSON et al.

Nos. 333 and 335.

SAME v. MUELLER et al.

Nos. 336 and 337.

(Circuit Court of Appeals, Sixth Circuit. February 10, 1896.)

1. APPEAL—WAIVER OF ASSIGNMENTS OF ERROR.

Failure of counsel, either in his brief or oral argument, to allude to one or more of his assignments of error, is a waiver thereof.

2. PATENTS—INFRINGEMENT SUITS—DEMURRER TO BILL.

It is now well settled that the question of novelty or invention may be raised by demurrer to the bill; that in considering this question the court may take judicial notice of facts of common and general knowledge tending to show want of novelty or invention; and that it may refresh and strengthen its recollection of what facts were of common and general knowledge at the date of the application by reference to any printed source of general information known to the court to be reliable, and to have been published prior to the application. But the court must keep strictly within the field of common knowledge, taking care to distinguish and exclude matters within its own special knowledge; and, if it have any doubt whatever on the question of novelty or invention, it must overrule the demurrer.

3. SAME—MECHANICAL PROCESS.

A process of rendering wood-fibre paper soft and pliable, by moistening it with a thin water solution of gelatin, and then crumpling and pounding it, and finally drying and smoothing it, is not a mere mechanical process or aggregation of functions, within the doctrine of Locomotive Works v. Medart, 15 Sup. Ct. 745, 158 U. S. 68, but is a true process, within Cochrane v. Deener, 94 U. S. 780.

4. SAME—ANTICIPATION.

A patent which provides, as one step of a process, for moistening wood-fibre paper with a thin water solution of gelatin, is not so clearly anticipated by a patent which calls for the use of a "suitable size" for a similar purpose as to authorize a court to declare it invalid upon demurrer to the bill. 69 Fed. 247, reversed.

**5. SAME—FIBRE CHAMOIS.**

> The McLauchlin patent, No. 511,789, *held* not so clearly wanting in novelty and invention, or so clearly anticipated, as to warrant the court in declaring it invalid on demurrer. *Held*, further, that the patent is not for a mere mechanical process, or aggregation of functions. 69 Fed. 247, reversed.

Appeals from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

These were six suits in equity brought by the American Fibre-Chamois Company,—two of them being against the Buckskin-Fibre Company and Hiram J. Halle, its president; two against Samuel Williamson (executor of the estate of Ralph R. Root, deceased), Lee McBride, and John M. McBride; and two against Peter G. Mueller, Charles E. Smith, and Thomas P. McMahon, partners doing business as the Cleveland Fibre-Interlining Company. In each case the bill was dismissed on demurrer for want of patentable novelty and invention (see 69 Fed. 247), and the complainant has appealed.

These are six suits in equity brought to enjoin the infringement of patent rights by the same complainant. Three of them (Nos. 332, 333, and 336) were brought against three different defendants to restrain the infringement of United States letters patent No. 511,789, issued to John C. McLauchlin January 2, 1894, for new and useful improvements for the manufacture of imitation dressed chamois buckskin from paper pulp in sheets. The defendants in each of these cases filed answers. No replications were filed by the complainant, and the defendants made motions to dismiss the bills on that account. Thereupon the complainant appeared, and moved to dismiss the bills without prejudice, on the ground that, having acquired another patent, it wished to include both in the same actions against the defendants, and proposed the dismissal without prejudice in order to unite the patents in a new bill. To this motion the defendants objected; asked leave to withdraw their answers, and to file demurrers to the original bills. This leave was granted to defendants. The demurrers were filed, and, after argument, were sustained by the court, on the ground that upon the specifications of the patents the court was able to declare, in view of the matters of common knowledge of which it could take judicial notice, that there was no patentable novelty or invention shown in either patent. Notwithstanding the action of the court in refusing to dismiss, the same complainant filed three new bills (Nos. 334, 335, and 337) for an injunction against the same defendants, respectively, in which it charged the defendants with the infringement of both the McLauchlin patent, and of a patent to T. Seymour Scott (No. 216,108), dated June 3, 1879, for an improvement in the manufacture of flexible paper, which the complainant had since acquired by assignment. To these bills demurrers were filed on the ground that both the McLauchlin and the Scott patents were void for want of patentable novelty. These demurrers were sustained, and decrees entered dismissing the bills. Appeals have been taken from all six decrees, and they have been heard as one case in this court.

The specification of the Scott patent, which was applied for February 8, 1879, was as follows: "The object of my invention is the production of a strong and waterproof flexible paper, adapted for use in the making of bed-covers, table and counter covers, wall hangings, floor coverings, and the like. Heretofore, when paper has been employed for such purposes, it has been made chiefly of rags, and has not had the requisite strength to withstand hard usage, and, not being strong and flexible, has been apt to crack and break in the creases. My invention designs to effectuate the making of a paper which shall be not only flexible, but also strong, and impervious to dampness. I take a paper composed of strong fibres, such as manilla, jute, linen, or the like, manufactured in the manner usual in the art, and of a quality capable of sustaining a tensile strain of not less than two hun-

dred pounds per inch in the direction of its length when made twelve square feet to the pound. While in the process of its manufacture, or after it has been made, I render this paper impervious to water by the application, in any desired manner, of suitable size. I then pass the paper so prepared through suitable breaking stamps or rollers, so as to render it limp or flexible; and this may be done either while the paper is yet in the paper machine, or in a separate machine adapted for the purpose. It sometimes becomes necessary to pass the paper several times through the breaking rolls, and sometimes in contrary directions. I then, when the uses to which it is desired to apply the product demand a very smooth surface, pass the paper, which has been rendered flexible as above described, through calender rolls, in order to smooth it. I have also discovered that oil-printed paper of the composition which I have mentioned may be passed in similar manner through breaking rolls, and rendered flexible. Having thus described my invention, I claim, and desire to secure by letters patent of the United States: (1) The process herein described of making flexible paper, which consists in passing manilla or kindred paper through breaking rolls, substantially as described. (2) The process herein described of making flexible paper, which consists in passing manilla or kindred paper through breaking rolls, and subsequently through calendering rolls, substantially as described. (3) As a new article of manufacture, strong, flexible paper, for wall hangings, covers, and the like, substantially as described."

The specifications in the McLauchlin patent, and the claims,' are as follows: "The object of my invention is to produce a fabric composed of fibre matted and formed into sheets, but having superior softness and flexibility, and a surface free from abrasion or disintegration of the fibre, and closely resembling chamois or buckskin. My invention consists in an improved process of making such fabrics. I am well aware that sheets composed of matted fibre have heretofore been made pliable by rubbing or crushing between knobbed rolls, such sheets or fabrics being designed to be used in the place of textile fabrics, and I am aware that my invention is limited to improvements in this art. I have discovered that wood fibre, treated by the sulphite or chemical process, is peculiarly fitted, by reason of its softness, to be used in a fabric designed as a substitute for cloth, and requiring the softness and flexibility of that fabric. The objections found to exist in fabrics thus made out of this kind of fibre by any of the methods of manufacture heretofore known to me, I have found to be these: That the sheets made of such fibre will, when rubbed to reduce the stiffness of the sheets, abrade upon the surface, and show a fibrous appearance, and lose in large measure the strength, as well as smooth or solid surface. If, further, the sheet of fibre be rendered flexible by pounding or crushing in a dry condition, the wood fibres will break, and the fabric is thus weakened, and its appearance also impaired. If it be made flexible by passing between knobbed or fluted rollers, the fabric is stretched and pulled in places, and thus the fibres are broken, and both the strength and the appearance in this way also are impaired. I have discovered that if these sheets of wood fibre, made of proper thickness to suit the purpose of blankets, linings, and the like, for which such sheets have been heretofore designed or used, be subjected to pounding, in a dampened condition, the softening may be effected without rupture of the fibre, or abrasion of the surface. Therefore, in carrying out my invention, I use sheets made of wood fibre,—preferably, what is known as sulphite or chemical fibre. These sheets I moisten with a thin solution of gelatin, using preferably one part of the gelatin to twenty parts of water. When the sheets have been evenly and thoroughly moistened with this solution, I subject them, in a crumpled condition, and with proper changes of position, to pounding, by any convenient form of pounder, until the sheets are thoroughly softened. I then smooth the sheets,—preferably, by passing them between rollers,—and dry them. The smoothing and drying may be effected at the same time, by using heated rollers or surfaces. When so made, the sheets retain the unbroken and unabraded surface, and are flexible and soft, resembling chamois or dressed buckskin. The wood fibres, which, if dry would break and disintegrate under the pounding, readily bend when moist, and retain their integrity. The small percentage of

gelatin also materially serves to promote this action, but I do not limit myself to this ingredient. I claim: (1) The process herein described of reducing fibrous sheets to a soft and pliable condition, the same consisting in first moistening and then pounding said sheets while in a moist condition, substantially as described. (2) The process herein described of reducing fibrous sheets to a soft and pliable condition, the same consisting in first moistening the sheets with a solution of gelatin, and then pounding said sheets while in a moist condition."

M. B. Philipp and Lawrence Maxwell, Jr., for appellant.

M. D. Leggett, A. E. Lynch, and M. R. Waite, for appellees.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

While the action of the court with respect to the Scott patent has been assigned for error, no argument pointing out the error of the court below in its decision thereon has been made, orally or on the brief. Where counsel for an appellant or a plaintiff in error files a brief and makes an oral argument, and does not allude in either to any of his assignments of error, he must be taken to have waived it. This court cannot be expected to examine the assignment of error, and find the reasons for reversal itself. The action of the court below, in so far as it sustained the demurrer to that part of the bill seeking to restrain an infringement of the Scott patent, must therefore be affirmed.

We have only to consider, therefore, the correctness of the court's ruling in sustaining the demurrer to the bills so far as they sought a remedy against the infringement of the McLauchlin patent. The rule is now well settled that a defendant to a patent infringement bill may raise the question on demurrer whether the alleged invention, as disclosed by the specifications of the patent, is devoid of patentable novelty or invention. Richards v. Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831; West v. Rae, 33 Fed. 45. It is also well settled that, in considering the question of the validity of a patent on its face, the court may take judicial notice of facts of common and general knowledge tending to show that the device or process patented is old, or lacking in invention, and that the court may refresh and strengthen its recollection and impression of what facts were of common and general knowledge at the time of the application for the patent by reference to any printed source of general information which is known to the court to be reliable, and to have been published prior to the application for the patent. Brown v. Piper, 91 U. S. 38. The presumption from the issuance of the patent is that it involves both novelty and invention. The effect of dismissing the bill upon demurrer is to deny to the complainant the right to adduce evidence to support that presumption. Therefore the court must be able, from the statements on the face of the patent, and from the common and general knowledge already referred to, to say that the want of novelty and invention is so palpable that it is impossible that evidence of any kind could show the fact to be otherwise. Hence

it must follow that, if the court has any doubt whatever with reference to the novelty or invention of that which is patented, it must overrule the demurrer, and give the complainant an opportunity, by proof, to support and justify the action of the patent office. This is the view which has been taken by the supreme court, and the most experienced patent judges upon the circuit. New York Belting & Packing Co. v. New Jersey Car-Spring & Rubber Co., 137 U. S. 445, 11 Sup. Ct. 193; Manufacturing Co. v. Adkins, 36 Fed. 554; Blessing v. Copper Works, 34 Fed. 753; Bottle-Seal Co. v. De La Vergne Bottle & Seal Co., 47 Fed. 59; Industries Co. v. Grace, 52 Fed. 124; Goebel v. Supply Co., 55 Fed. 825; Hanlon v. Primrose, 56 Fed. 600; Dick v. Well Co., 25 Fed. 105; Kaolatype Co. v. Hoke, 30 Fed. 444; Coop v. Development Inst., 47 Fed. 899; Krick v. Jansen, 52 Fed. 823; Manufacturing Co. v. Housman, 58 Fed. 870; Davock v. Railroad Co., 69 Fed. 468; Henderson v. Tompkins, 60 Fed. 758. Referring to his previous decision, Judge Blodgett said in the case of Manufacturing Co. v. Adkins, 36 Fed. 556:

"In West v. Rae, 33 Fed. 45, this court sustained a demurrer to a bill charging infringement of a patent on a device for protecting woolen blankets from insects by incasing them in paper bags, on the ground that, within the common knowledge, it was old to wrap or incase woolens in paper to protect them from dust or insects. At the time I announced the decision in that case, I stated that its effect might be to encourage counsel to demur to bills for infringement of patents in cases where they, from their special knowledge of the art, might be of opinion that the device covered by the patent was old. And my anticipations in that respect have been fully realized, as that decision has already produced in this court quite a bountiful crop of demurrers in this class of cases. But the court must meet each case as it arises, and, in sustaining demurrers like this, keep strictly within the field of common knowledge. The practical difficulty and danger is in defining where special knowledge leaves off, and common knowledge begins. The judge must always be careful to distinguish between his own special knowledge, and what he considers to be the knowledge of others, in the field or sphere where the device in question is used. But when the judge before whom rights are claimed by virtue of a patent can say, from his own observation and experience, that the patented device is, in principle and mode of operation, only an old and well-known device, in common use, he may act upon such knowledge. The case must, however, be so plain as to leave no room for doubt. Otherwise injustice may be done, and the right granted by the patent defeated, without a hearing upon the proofs. The judge must, on all such questions, vigilantly guard against acting upon expert or special knowledge of his own, instead of keeping strictly within the field of general or popular knowledge. While I do not intend to lay down a rule, I am free to say that I should not feel justified in holding a patent void for want of novelty, on common knowledge, unless I could cite instances of common use which would at once, on the suggestion being made, strike persons of usual intelligence as a complete answer to the claim of such patent."

In Krick v. Jansen, 52 Fed. 823, Judge Townsend said that a demurrer should not be sustained to a bill for infringement of a patent unless the want of patentable novelty was "palpably manifest."

Is it within common knowledge that the process described by McLauchlin in his specifications is old? We think not. In his specification, McLauchlin refers to the prior art, admits that the treatment of matted fibre for the purpose of using the same in place of cloth, and of giving it the flexibility necessary for that purpose,

by rubbing or crushing it between knobbed rollers, was old. But he points out that, by such processes as had theretofore been used, the surface of the fibre was abraded, and the material itself thereby lost, in a large measure, its strength. The process, for which Mc-Lauchlin sought a patent, was that of first moistening the sheets of matted fibre, and then pounding them in a dampened and crumpled condition. The moistening was to be done with a mixture of 20 parts water and 1 part gelatin. The question is whether it is a matter of common knowledge that the way to render wood-fibre paper soft and pliable, without injury to its strength or smooth-ness of surface, is to moisten it with a thin water solution of gela-tin, to crumple it and pound it in a moistened condition, and then to dry and smooth it. It is, of course, generally known that the moistening of fibre of any kind will make it, for the time being, more flexible; but common knowledge would probably lead us to suppose that the moistening of such a material as paper, while it would for the time render it more flexible, would make its surface very much more subject to abrasion, and render the whole texture very liable to injury and destruction. Possibly a review of the art by an expert will show that to treat paper in a moistened condi-tion by pounding or irregular pressure for the purpose of render-ing it flexible without loss of strength was old, but such a process is not within our common knowledge. Certainly, to use Judge Blodgett's standard, we cannot cite instances of common use of this process or a similar process which would at once, on the sug-gestion being made, strike persons of usual intelligence as a com-plete answer to the claim of such patent. The court below referred to a leather machine for making leather more flexible by pounding. It seems to us that the very great difference between the character of leather and paper is enough to show that the use of a device with respect to one does not indicate its useful application to the other. Again, allusion is made by the learned judge, in his opinion, to an article in the Polytechnic Review, 1877 (volume 3, p. 40), in which the following statement is made of Japanese uses of paper.

"Paper is also often used as a substitute for cloth for umbrellas, rain coats, etc., and even for dress cloth. 'Shibu' and the 'Ye-no-abura' are the means employed for rendering the paper waterproof. This cloth is generally made of paper alone, by beating it to make it soft, and impregnating it with a gummy substance to make it more resistant to the action of water."

The learned judge also referred to the description of the making of paper cloth in Japan given in the second volume of the Ency-clopedia of Chemistry, published in 1879 (page 534). That de-scription is as follows:

"The mode in which paper cloth 'warranted to wash' is made in Japan is thus described: Take some of the paper called 'hosho,' or some of the best 'senka,' and dye it of the color required. Boil some of the roots called 'kon-niaku-no-dama,' with the skins on. Try them with the inner portion of a rice stalk. When it penetrates easily they are sufficiently boiled. Peel them, let the water run off, and then pound them into a paste. Spread this paste on either side of the paper, and let it dry in the sun till quite stiff. Then sprinkle water upon it till it is thoroughly damp, and leave it in that state for a night. The next morning roll it upon a bamboo of the thickness

of the shaft of an arrow, and force it with the hands from either end into a crimple in the centre. Unroll it, and repeat this process two or three times, rolling it from each side and corner of the paper. Then crimple it well in the hands, by rubbing it together till it becomes quite soft, and then sprinkle water on it again to damp it. Pull it out.straight and smooth, fold it up, and pound it with a wooden mallet. It may then. be put into water as much and as often as is desired, without sustaining injury, having become a strong and lasting material. Boxes, trays, and even saucepans, may be made of this cloth, and saucepans thus manufactured sustain no injury over a strong charcoal fire. Bags may be made of it, in which wine may be put, and heated by insertion in boiling water. Paper thus prepared may be used for papering windows, and, without being oiled, will withstand the rain."

It is well settled that, in taking judicial notice of matters of common knowledge, the court may refresh its recollection by reference to standard works. Brown v. Piper, 91 U. S. 38. In that case a patent had been issued for the process of freezing fish, and keeping them in a frozen state of preservation, in a close chamber, by means of a freezing chamber, having no contact with the preserving chamber. There the court took judicial notice of the fact that the ice-cream freezer, as a matter of common knowledge and .use by the people throughout the country, was operated on substantially the same principles; and, having thus pointed out one well-known instance easily within the actual knowledge of the court, it referred to articles in the encyclopedia showing the preservative effect of cold,—a principle belonging to the general domain of knowledge and science. But in this case the learned judge at the circuit was not able to point, within his personal knowledge, to any process similar or analogous to that here patented. He was obliged to refer to descriptions of processes used in Japan, which we may reasonably suppose did not refresh his recollection with respect to the process there described. They were not instances of a process generally in vogue in the same or kindred arts well known to ordinary life. Indeed, it is very doubtful whether much light is thrown upon the Japanese processes, by the descriptions above given. It is also doubtful whether the paper "warranted to wash" is like the material produced by the complainant's process. It is by no means clear that the process described in the Polytechnic Review is one which involved the dampening of the paper, and the pounding of it in a dampened state. We are clearly of opinion that there was sufficient doubt about the novelty, utility, and invention of the complainant's process to require the overruling of the demurrer, and a hearing of these questions upon issues made by the answer and proof.

It is also contended that the process described is a mere mechanical process,—an aggregation of functions,—within the limitation announced by the supreme court, through Mr. Justice Brown, in the case of Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745. In that case the patent was for an improved process in manufacturing belt pulleys, formed of a wrought metal rim and a separate center, usually a spider, and usually made of cast metal. The process of manufacture was set forth in detail, and consisted

of the following steps:  (1) Centering the pulley center or spider; (2) grinding the ends of the arms concentrically with the axis of the pulley; (3) boring the center; (4) securing the rim to the spider; (5) grinding the face of the rim concentric with the axis of the pulley; (6) grinding or squaring the edges of the rim. It was held that, on the face of the specifications and claims, the patent was not for the mechanism employed, nor for the finished product of manufacture, but was, in effect, for a process of solely mechanical steps, and that a valid patent could not be granted for the mere operations of a piece of mechanism, or, what was the same thing, for the function or functions of a machine.  We do not think that the present case comes within the principles announced.  The treatment of paper in this instance is of a character to change its quality, giving it new and useful attributes.  The moistening of it, and the treatment in a moistened condition, is more or less chemical in its character.  In Cochrane v. Deener, 94 U. S. 780, which Mr. Justice Brown cites in Locomotive Works v. Medart, the patent was for a process in manufacturing flour, which consisted in passing the ground meal through a series of bolting reels, composed of cloth of progressively finer meshes, which passed the superfine flour, and retarded the escape of the finer and lighter impurities, and by which the superfine flour was separated, and the impurities were so eliminated as to produce superfine flour.  It was held to be valid, and the patent was not limited to any special arrangement of machinery.  In that case Mr. Justice Bradley said:

"A process is a mode of treatment of certain materials to produce a given result.  It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing.  If new and useful, it is just as patentable as is a piece of machinery.  In the language of the patent law, it is an art.  The machinery pointed out as suitable to perform the process may or may not be new or patentable, whilst the process itself may be altogether new, and produce an entirely new result.  The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

It seems to us that the present case is clearly within that of Cochrane v. Deener, and even more nearly to be likened to a chemical process than was that.

The third objection made to the validity of the patent is one which can only be made in three of the cases appealed from, to wit, those in which the Seymour Scott patent was also made a part of the bill.  It is said that the Seymour Scott patent so clearly anticipates the McLauchlin patent, on the face of the specifications, that the McLauchlin patent must be held to be bad.  We do not think that, without evidence, it is clear that the material in the Scott patent is to be subjected to the breaking rollers while in a dampened condition, through this might be developed by proof of the process of paper making referred to in the Scott patent.  There is nothing in the Scott patent with reference to the crumpling of the paper, or the pounding of it in its crumpled condition.  The crumpling of the paper is not expressly made a part of the claim, but it is described as a part of the process, and, if an essential

part of the process, then it should be read into the claims. The specification in the Scott patent requires the paper to be subjected to "suitable size." That of the McLauchlin patent requires that the paper shall be moistened by a thin solution of gelatin,—preferably, 1 part in 20. What "suitable size" is in the Scott patent, and whether it would suggest the use of the thin solution of gelatin mentioned in the McLauchlin patent, are all questions upon which the court cannot now pass, without evidence of experts in paper making before it.

The decrees in these various cases dismissing the bill as to the McLauchlin patent will be reversed, with directions to overrule the demurrers and require answers; while the decrees, in so far as they dismiss the bills on the Scott patent, are affirmed. In view of the fact that this result shows that it was unnecessary for the complainant to bring second actions, the order as to costs will be that the costs of the appeals in the three cases (Nos. 332, 333, and 336) in which bills were filed on the McLauchlin patent alone will be taxed to the appellees, while in the three cases (Nos. 334, 335, and 337) in which the three cases were filed on both the Scott and the McLauchlin patents the costs will be taxed to the appellant; and it is so ordered.

