GAINES et al. v. ALABAMA CONSOL. COAL & IRON CO. et al.

(Circuit Court, N. D. Alabama, S. D.　October 6, 1909.)

No. 182.

1. PATENTS (§ 310*)—VALIDITY—DETERMINATION ON DEMURRER.

To authorize a court to declare a patent void on demurrer, it must appear from its face and from common and general knowledge of the prior art that the want of novelty and invention is so palpable that it is impossible that evidence of any kind could show the fact to be otherwise.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 535–540; Dec. Dig. § 310.*

Pleading in infringement suits, demurrer for want of novelty and invention, see note to Caldwell v. Powell, 19 C. C. A. 595.]

2. PATENTS (§ 26*)—INVENTION—COMBINATION OF OLD ELEMENTS.

To constitute a patentable combination of old elements, they must by their joint action produce a new and useful result, or an old result in a cheaper or otherwise more advantageous way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*]

3. PATENTS (§ 328*)—VALIDITY.

The Gaines and Cox patent No. 760,189, for plant for feeding metallurgical furnaces, held not void on its face.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit by Ambrose P. Gaines and Edwin R. Cox, Jr., against the Alabama Consolidated Coal & Iron Company and others as its officers for infringement of letters patent No. 760,189 for plant for feeding metallurgical furnaces, dated May 17, 1904, granted to Ambrose P. Gaines and Edwin R. Cox, Jr. On demurrer to bill. Demurrer overruled.

Smith & Frazier, for complainants.
R. D. Johnston, Jr., for defendants.

GRUBB, District Judge. The equity of the bill of complaint is attacked by the general demurrer of the defendant upon the ground that the patent, which it is charged that defendant infringed, was invalid for want of invention and patentable novelty.

The invalidity must appear upon the face of the patent, and from facts of which the court takes judicial knowledge, and must so appear as to be clear and free from doubt. The rule, in hearings of this nature upon general demurrer, is well settled that:

"In considering the question of the validity of a patent on its face, the court may take judicial knowledge of facts of common and general knowledge, tending to show that the device or process patented is old, or lacking in invention, and that the court may refresh and strengthen its recollection and impression of what facts were of common and general knowledge at the time of the application for the patent by reference to any printed source of general information which is known to the court to be reliable, and to have been published prior to the application for the patent. Brown v. Piper, 91 U. S. 38,

23 L. Ed. 200. The presumption from the issuance of the patent is that it involves both novelty and invention. The effect of dismissing the bill upon demurrer is to deny to the complainant the right to adduce evidence to support that presumption. Therefore, the court must be able, from the statements on the face of the patent, and from the common and general knowledge already referred to, to say that the want of novelty and invention is so palpable that it is impossible that evidence of any kind could show the fact to be otherwise. Hence it must follow that, if the court has any doubt whatever with reference to the novelty or invention of that which is patented, it must overrule the demurrer, and give the complainant an opportunity, by proof, to support and justify the action of the patent office." American Fiber-Chamois Co. v. Buckskin-Fibre Co., 72 Fed. 508, 18 C. C. A. 662.

In this case, the patent covered an apparatus, the purpose of which was to convey stock (coke, ore, and limestone) from the stockyard or bins to the furnace, handling and unloading it automatically. The original method of filling the furnace with stock was by means of "buggies" loaded on the stockyard by hand, wheeled by laborers onto the cage of a vertical elevator, by which they were hoisted to the top of the furnace and rolled off the cage to the mouth of the furnace, and unloaded by hand into the furnace. The method covered by the patent adopted the vertical hoist or elevator and cage. Instead of loading and rolling buggies onto the cage at the bottom of the furnace, and rolling them off the cage when it had reached the top of the furnace, and unloading them into the furnace, all by hand, complainant's method adopted the use of a car operating on a track on the floor of the cage, which was loaded direct from bins containing the stock, and while standing on the cage and hoisted to the top loaded, where it was mechanically released from the cage running down a track connecting with the track on the cage to the mouth of the furnace, where it was dumped mechanically and returned mechanically to the cage, empty. The improvement consisted in the economical handling of the stock, due to the saving in labor.

It becomes important, in determining the question of invention or patentable novelty, to arrive at the stage of the art at the time of complainant's application for the patent under consideration, which was in January, 1904. From the recitals of the patent itself, it appears that, at the time it was applied for, there had been generally introduced among furnacemen a device for handling stock from the yard into the furnace known as the incline or skip hoist. Beginning with line 22, p. 1, the recital is:

"Nearly all furnace plants using vertical hoists were built prior to the general introduction of the skip or incline hoist, and it entails a very large expense to reconstruct such furnaces for the incline hoist, often necessitating a new furnace, because the old shells are generally too thin to support the weight of such incline or skip hoist. Our invention, which secures all the advantages of the modern skip hoist, can be applied to all such furnaces at a cost so small as may well be considered nominal."

It thus appears from the recitals of the patent itself that the skip or incline hoist was in general use when complainant's patent was applied for, and that the advantages claimed for complainant's invention were those realized by the skip or incline hoist. The exhibits, offered by defendants to refresh the recollection of the court, consisting of trade and scientific journals, published prior to the com-

plainant's application, show the same fact, and illustrate the nature of the apparatus, known as the skip or incline hoist, and its method of accomplishing the advantages which complainant contends are also the resultant of his invention.

The court has arrived at the conclusion that the fact that the skip hoist was in general use prior to the application of complainant for his patent, and the general character of skip hoists are matters of common knowledge in this district, of which the court will take judicial notice, and are shown as well by the recitals of complainant's patent. The skip hoist was an inclined instead of vertical elevator, running from the foot to the top of the furnace, on which its weight rested, and on which cars, loaded at the foot, were lifted to the top and automatically dumped into the mouth of the furnace, being returned automatically for reloading. The skip car was loaded indifferently at different plants, either direct from bins, while standing at the bottom of the incline, or from larries, which were loaded from the bins, and which conveyed the stock to the foot of the incline, and, standing over the incline car, dumped its load into it, while it was stationary at the bottom of the incline; and possibly there existed types where the incline car was moved by an electric motor away from the foot of the incline to the bins, to be loaded, and was then by it returned to the incline foot for hoisting to the furnace. In this stage of the art, the complainant applied for his patent, and the controlling inquiry is whether his apparatus shows invention or patentable novelty, in view of the fact that the incline or skip hoist was in general use at and before the date of his application. It appears from the claims of the patent that there was no new element in the combination or aggregation described and claimed in it. The only suggestion of novelty in any one of the separate elements is that the car is loaded on the cage while stationary on it. Conceding that this method had never been used prior to complainant's application, it is not the result of an original conception in the sense of an invention, but, at most, mere mechanical adaptation, and not patentable. But the method of loading the incline car while standing on the incline track in the incline pit, both from larries and from bins direct, was in general use before the complainant's application, and is the equivalent of loading the cage car while stationary on it. Numerous other instances of the same method at mines have long been in general use in all mining districts. Unless, therefore, the combination was patentable, as such, the patent cannot be sustained.

The rule as to when a combination of all old elements may be patented is expressed in the case of Richards v. Chase Elevator Co., 158 U. S. 302, 15 Sup. Ct. 833, 39 L. Ed. 991, as follows:

"Unless the combination accomplishes some new result, the mere multiplicity of elements does not make it patentable. So long as each element performs some old and well-known function, the result is not a patentable combination, but an aggregation of elements."

And in Stephenson v. Brooklyn R. R. Co., 114 U. S. 149, 5 Sup. Ct. 777, 29 L. Ed. 58, as follows:

"A combination is patentable only when the several elements of which it is composed produce, by their joint action, a new and useful result, or an old result in a cheaper or otherwise more advantageous way."

173 F.—20

In the case of Burt v. Evory, 133 U. S. 349, 10 Sup. Ct. 394, 33 L. Ed. 647, it is thus stated:

"Neither is it invention to combine old devices into a new article without producing any new mode of operation."

In the case of Loom Co. v. Higgins, 105 U. S. 591, 26 L. Ed. 1177, it is thus stated:

"At this point we are constrained to say that we cannot yield our assent to the argument that the combination of the different parts or elements for attaining the objects in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce 50 yards a day when it never before had produced more than 40; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

If the state of the art, at the time of complainant's application, was represented by the vertical hoist and its buggies, as hereinbefore described, it might well be contended that complainant's device for automatic loading and handling created a new result, though by a combination of old elements, and was patentable. This result, at the time of complainant's application, had, however, been anticipated by the general use of the skip or incline hoist, which produced the same results as complainant's device was designed to do, viz., the automatic loading and handling of stock into the furnace. Both the incline hoist and complainant's device were combinations of old elements, patentable, if at all, only by reason of producing a new result, or an old result with greater economy. Complainant's device having been patented after the incline hoist had come into general use, and producing the same result only in operation and economy as it did, cannot be said to produce a new result, or an old result in a cheaper or more advantageous way than was in general use when the patent was applied for.

The only advantage claimed for complainant's system over the incline hoist is that it can be applied to a class of furnaces to which the incline hoist is not adaptable. The patent recites that many existing furnaces are constructed with a vertical hoist, and that to introduce the incline hoist it is necessary to reconstruct such furnaces at great cost, for the reason that the original construction was not of sufficient strength to support the incline, as it leans against the furnace tower. Complainant's apparatus, it is claimed, furnishes an automatic system of loading and handling the stock into these furnaces, without reconstruction and with small cost. Applying to the class of furnaces with vertical hoists, it may be said that this result, accomplished by complainant's system, is new, since the incline hoist is claimed to be inapplicable to furnaces not constructed with special reference to its installation, and with the old-style vertical hoists. To devise a method by which a large class of existing furnace plants could be furnished with an automatic loading and handling apparatus, without reconstruction, might, in itself, constitute invention.

In the case of Western Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294, the Supreme Court held that the application of a torsional spring, theretofore used in connection only with clocks, doors, and other articles of domestic furniture, to a telegraph key, was such a new use as would make the combination patentable, and said (page 605 of 139 U. S., page 671 of 11 Sup. Ct. [35 L. Ed. 294]):

"Indeed, there is nothing in any of these exhibits which shows the use of a torsional spring in a telegraphic instrument, and, while this invention does not seem to be one of great importance, we think the adaption of this somewhat unfamiliar spring to this new use, and its consequent simplification of mechanism, justly entitles the patentee to the right of an inventor."

In the case of Vinton v. Hamilton, 104 U. S. 485, 26 L. Ed. 807, the court intimates that it was only the prior use of an ordinary foundry cupola furnace by others than the applicant for resmelting the iron contained in furnace slag that prevented this nonanalogous use of an old device from being patentable.

In the case of Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 198, 39 L. Ed. 275 the court said:

"But where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries; what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use—particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device, and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor."

And again:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

In view of these authorities, if there were no question in this case of anticipation arising out of the prior general use of the skip or incline hoist, the apparatus of complainant might show invention in applying old devices to new uses and a new industry. So far, and so far only, as the incline or skip hoist can be applied, it anticipates the use of complainant's apparatus. If there is a class of furnaces to which the skip or incline hoist cannot be applied and to which complainant's apparatus is capable of application, it may be that the patent

issued to cover it may be shown to be valid and to apply to that class of furnaces.

The demurrer will be overruled, and the defendant allowed 30 days from the date of this decree to answer the bill of complaint.