## DUNCAN et al. v. STOCKHAM et

(Circuit Court of Appeals, Seventh Circuit. October 31, 1912. Rehearing Denied March 11, 1913.)

No. 1,896.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—COAL WASHER.

The Stewart patent, No. 657,184, for a coal washer, was not anticipated, and, while not of broad scope, discloses novelty and invention; also *held* infringed.

2. PATENTS (§ 177*)—CONSTRUCTION—IMPLIED MEANS.

A claim of a patent for a combination is to be interpreted to include such connections and relations of the several means of the combination which are named as implied therewith to make them operative in conformity with the specification.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 253, 254; Dec. Dig. § 177.*]

Appeal from the District Court of the United States for the Southern Division of the Southern District of Illinois; J. Otis Humphrey, Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by William H. Stockham and the Roberts & Schafer Company against James Duncan, George D. Duncan, and William M. Duncan, copartners doing business as the Duncan Foundry & Machine Works, the American Coal Washer Company, James Duncan, and the Lumaghi Coal Washing Company. Decree for complainants, and defendants appeal. Affirmed.

The appellants are defendants in a bill filed by the appellees charging infringement of letters patent, and this appeal is from a decree entered against them as infringers, on final hearing of the issues. The patent in suit is No. 657,184, for a "coal washer," issued to E. A. Stewart September 4, 1900. Its specification and single claim of invention read as follows, after the introductory statement:

"Figure 1 is a side elevation of the coal washer. Figure 2 is a plan view of the coal washer. Figure 3 is a section on line 3 3 of Fig. 1. My machine consists of a framework. A, which supports the mechanism of the jig, and in which are inclosed tanks B, C, D, and E. The bottom of the chamber C below the jig box H inclines to cause said tank to terminate in a pocket F, in which is the bottom or boot of a bucket elevator G. The jig H is a boxlike structure having a perforated bottom and which reciprocates vertically in suitable guideways I. The perforated bottom J is inclined from rear to front and is made of perforated metal. At the front of the jig H is an opening K for the discharge of the washed coal and water, formed by omitting the upper part of the front end wall of the jig H. The front end wall below the opening K is inclined rearward and downward to the bottom of the jig and terminates in an opening L for the discharge of the impurities separated from the coal. The coal is fed into the jig at its rear. The jig H is given a vertically reciprocating motion by means of eccentrics M, secured on shafts N, mounted in bearings on frame A. A lateral space is left above the pocket F, in which is mounted a perforated bucket elevator G to remove the slate. There is a partition which separates the space occupied by perforated elevator G from tank C, there being merely an opening large enough to allow the impurities to pass from the inclined bottom of tank C to the boot F of perforated elevator G. The jig discharges the clean coal into tank D, from which it is elevated by a perforated bucket elevator O. The surplus water in tank D overflows into tank E, from which it is pumped by the centrifugal pump P into tank B, thus keeping up a constant circulation of water. Between the tanks B and C is an opening Q, which is provided with a valve R, which opens when the jig H rises and closes when the jig H is forced down. Attached to the inside of the tank C are metallic plates S, and attached to the outside of jig H are metallic plates T. The size of the inside of the metallic plates S is the same as the outside plates T on the jig, forming a sliding joint.

"The operation of my washer is as follows: The unwashed screenings are discharged into the jig, and a vertical movement of reciprocation is given the jig by the mechanism provided for that purpose. When the jig H is raised, it sucks the water through the opening Q from tank B to tank C. When the jig is forced down, it closes the valve R, forcing the water up through the material in the jig H. This causes the material in the jig H to be suspended a short time in the water during the downward movement of the jig, so as to give the heavier portions an opportunity by the rapid subsidence to arrange themselves as the lower strata, while the lighter portions form the upper strata. When the material reaches the height of the lower edge of the discharge opening, the clean coal, which is uppermost, will pass through and fall upon the chute into the tank D, while at the same time there is a constant discharge of impurities through the opening at the bottom of the jig, said impurities falling along the inclined bottom of tank C into the pocket F, whence they are removed by the bucket elevator.

"Having thus described my invention, what I desire to secure by letters patent is: The combination in a coal washer of a vertically reciprocating jig H, provided with a perforated bottom J, metallic sliding joints S T on

its sides, water tank *C*, with inclined bottom, perforated bucket elevator *G*, tank *D*, elevator *O*, tank *E*, centrifugal pump *P*, tank *B*, opening *Q* between tanks *B* and *C*, valve *R* to close opening *Q*, substantially as described."

And the drawings are as follows:

Fig.1

Fig.2

Fig.3.

,Howard G. Cook, of St. Louis, Mo., and Thomas A. Banning, of Chicago, Ill., for appellants.

Parker & Carter, of Chicago, Ill. (Francis W. Parker and Donald M. Carter, both of Chicago, Ill., of counsel), for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The Stewart patent (No. 657,184) in suit is for "an improvement in coal washers," and its means, operation, and objects are well described in the specifications. This appeal is brought for reversal of a decree which upholds the validity of the patent and grants relief against the appellants, as infringers of its single claim of invention, reading as follows:

"The combination in a coal washer of a vertically reciprocating jig H, provided with a perforated bottom J, metallic sliding joints S T on its sides, water tank C, with inclined bottom, perforated bucket elevator G, tank D, elevator O, tank E, centrifugal pump P, tank B, opening Q between tanks B and C, valve R to close opening Q, substantially as described."

The purpose of the structure thus claimed as an improved means is to receive from the dump the product of the mine, in mingled coal and slate, wash and separate the coal from the slate, and deliver the coal through such process in marketable condition. As aptly described in the brief for appellees, the operation is as follows:

"The unwashed and mingled coal and slate enters through the trough at the left and falls into the water in jig H at the left side. It moves across the jig because of its inclined bottom, the introduction of the material at the left and its escape at the right, and the flow of water upwardly and to the right through the jig. The washed coal and water escape at the right from the top of the jig and have a free fall into the washed coal tank D, and the slate falls through the opening in the bottom of the tank at the right and down into the small hole leading to the refuse elevator G in the tank, which is placed alongside of the jig tank C. When the jig rises the slate sections act as valves to close the perforations in the bottom of the jig, and then the jig lifts its contents and draws in water through the circulating system from the pump tank E and through the valve R, while at the same time a portion of the water so lifted flows with washed coal out into the tank B. The moment the jig begins to descend, the valve R is closed, and the hole between the tanks being full of slate and refuse, the water is confined in the closed jig tank, but is free to move upwardly through the jig and laterally to the right, whereupon a further quantity of water with washed coal moves toward the right through the jig and falls into the tank D, while the slate moves toward the right and falls into the bottom part of the tank C. Thus the discharge action of the device is continuous. A lively bed of material, which is the condition for successful separation, is maintained by this intermittent upward rush of the whole body of water through the perforations, and by this continuous lateral movement of water ·and coal and refuse toward the right."

Defenses are set up, challenging the validity of the patent and asserting noninfringement of the invention claimed. We believe infringement plainly appears, if the patent is sustainable, and that the slight variations in structure relied upon for denial thereof do not merit discussion. The contentions of error in upholding the patent claim of invention are: (a) That anticipations appear in prior publications and patents; (b) that the means "lack novelty in view of the

prior art"; and (c) that the structure is a mere aggregation of prior means. Whether one or more of these propositions is supported by the evidence presents the inquiry upon which the merits of the controversy must be determined.

[1] The record exhibits numerous earlier patents for coal washers or separators and ore jiggers—commencing with Bradford's patent No. 143,219, issued in 1873—all showing use of jigs or "jumping jigs," in combination with water tanks and various other means, for like general purpose or analogous uses, and they establish the fact—conceded, as well, on behalf of the appellees and so referred to in the specifications of the patent in suit—that Stewart's device was a mere improvement of such general means of the prior art for the so-called "coal washer." The fact of improvement over these prior devices in operation and results is well established. Its combination or assemblage of means for the purposes of the structure is not disclosed in any one of these prior patents; and we do not understand the argument of counsel for appellants to predicate the defense of anticipation on one or another of such references, in the extended review thereof submitted in their briefs and in the testimony, beyond their undoubted effect to narrow the field of invention which was open to the patentee, Stewart, for his claim in suit. We believe, therefore, that review of these various patents is not needful for discussion of any of the issues raised to defeat the patent, under the limited scope of invention involved herein.

The crucial inquiry of patentability, however, arises out of an important publication of a German text-book, bearing date in 1870. It is referred to in the record as "Rittinger's publication," pleaded and introduced in evidence as an anticipation of the Stewart patent, and the information there published requires careful analysis for solution of issues which are thereby raised. The text-book and supplements are entitled (as translated) "Of the Science of Preparation of Ores," bearing date in 1870 and 1873 and printed in the German language. The publications in evidence are well authenticated as German copies of the work which have been on the shelves of the St. Louis Public Library "continuously since September 2, 1889," and they are of undoubted force as publications open to the public long prior to the date of the invention claimed by Stewart, so that, in so far as they describe with precision a complete and operative means for like purpose, the law applicable to patents charges the patentee with notice thereof, as of the prior art. 1 Robinson on Patents, § VIII.

Rittinger's treatise contains descriptions of methods and drawings of apparatus for treatment of ores, and translations of excerpts from the text are introduced in the record as pertinent citations, together with the drawings referred to, which appear as "plates" in an accompanying atlas. The text relates only to "a fine material (grain) jig machine," for use of water for separation of grains of ore from sand or like refuse—obviously applicable as means for separating gold or precious metals, in placer mining—and neither text nor drawings purport to deal with coal washing, or with problems involved therein for separation of the coarse mineral from slate or other substance

heavier than the mineral. But certain of the drawings and brief descriptive matter are relied upon as anticipations; and the drawings referred to are as follows:

The contentions of the appellants as to the means thus provided and pointed out are stated in their brief as follows:

"Briefly, this Rittinger device consists of a framework supporting a series of tanks, and ore and water-handling mechanism to provide for a compact and unitary structure. At one end of the framework, a jig tank is mounted, in the upper end of which a jig is arranged for vertical reciprocation by means of suitable connecting rods depending from eccentric straps mounted on a shaft driven by a motor. The jig has a perforated bottom plate, which has a lowered portion toward the discharge side of the jig and an opening at this side for the escape of some of the heavy material, containing bits of ore, into a chute, where this material is deposited in a trough, from whence it is to be removed, presumably, by a manual operation. The perforations in the bottom of the jig allow the heavier fine material to sift through and accumulate in the bottom of the jig tank, which tank has an inclined or hoppered bottom, which directs said material to an opening at the bottom of one of its side walls, in which opening is fitted a pipe, closed at the outer end by a plug adapted to be intermittently removed, manually, for the escape of collected fine material, and a part of the water, from the jig tank, into a trough provided for its reception, and from which trough it is removed at intervals, presumably, by a manual operation. A gasket, or leather angle strip, is secured to the lower side of the jig to prevent the escape of water between the sides of the jig and the sides of the jig tank, when the jig is reciprocated. This Rittinger publication shows two jigs in tandem; but in coal washers, as testified to by defendants' witness, Calvin M. Woodward, the jigs are not used in series, but any number of jigs may be used side by side, operating with a common outfit of tanks, elevators, etc. Water is primarily supplied by filling the tanks, after which the jig tank gets its supply from a supply tank located at one end, and from a fresh water supply tank located at one side, of the jig tank, both of which water supply tanks communicate with the jig tank through openings in the partition walls beneath the jig, which openings are covered by simple flap valves hung within the jig tank. These tanks are referred to in the Rittinger translation by Mr. Garrels as 'sluices.' An overflow or ore and water-receiving tank is mounted adjoining the second jig tank immediate the discharge side of said jig. This tank is provided with a hoppered bottom for directing the accumulating material to an opening in the side wall, which opening is closed

by a plug or faucet; this material being withdrawn at intervals by removing this plug, or opening the faucet—a manual operation. This overflow tank has a vertical partition descending from the top of the framework to a point below the water level to provide a separate water pump compartment in which a water screw is disposed for lifting the cleared water over a partition to a water-receiving box, or sluice, which connects with the water supply tank located at one end and of the jig tank through a connecting sluice at the bottom of the framework and beneath, at one side, of the jig and overflow tanks. A centrifugal pump may be substituted for the water screw."

This Rittinger device, therefore, alike with the Stewart patent, presents a combination for an ore washer employing these well-known means: "Vertically reciprocating jig," having a "perforated bottom"; water or jig tank with inclined bottom; pump for operating the water; and various old connecting means, including an opening between the water supply chamber and jig tank, covered by a simple valve. Although it is both obvious and conceded that Rittinger dealt with a different problem, in the character of the material to be separated, and that without entire reorganization and change of structure his device could not be made operative for a practical coal washer, the contention in respect thereof is thus summarized in the reply brief submitted on behalf of the appellants: That the foregoing drawings of Rittinger disclose "every element and the combination of all the elements enumerated in the Stewart claim, when supplemented by such obvious mechanical expedients as were known to the art, and as can be supplied * * * by mere mechanical knowledge and skill and without the exercise of invention." We believe the first two issues raised of (a) anticipation and (b) want of novelty, if not the remaining issue (c) of aggregation, rest on the tenability of the above proposition.

In support of this contention the argument proceeds to analyze the single Stewart claim into its assumed elements, under the terms therein used, reading each in the literal general sense of the term named, without reference to certain features "substantially as described" in the specifications, which show the connection in which the element is used and are plainly needful for operativeness in the combination. Upon these premises, the assumed elements of the Rittinger device are compared therewith, element for element, with deduction (as above mentioned) that Rittinger shows each and every element of the Stewart device, in like combination, excepting the two elevator provisions of Stewart, named in the claim as "perforated bucket elevator G" and "elevator O"; and in respect of these provisions the above assertion is made as "obvious mechanical expedients," not involving "the exercise of invention." We believe, however, that neither theory thus advanced for defeat of the patent can be upheld to that end.

On reference to the elevator means of Stewart and their purpose in his combination, if it be assumed that other elements of the claim are rightly interpreted by counsel for the appellants, we are not satisfied that their introduction, in connection with the conceded and obvious reorganization of Rittinger's disclosures, for means for a coal washer, may not have patentable force as a new combination. With Rittinger's

drawings and descriptions presumptively known to the patentee, applicable alone to the separation of fine materials—such as particles of gold and the lighter silt or sand to be treated—invention may well be open, as we believe, for solution of the problem then presented to Stewart for improved means for a coal washer. Although Rittinger's publication may be presumed to furnish aid for solution, can it be accepted as solving Stewart's quest?

"Water tank $C$ with inclined bottom" of the patent claim is alleged to be completely met by the "jig tank" shown in Rittinger's foregoing drawing, Fig. 297b, and it is true that striking similarities appear in their drawings respectively. In their relations to the entire means, however, they differ materially in operation and function. The incline bottom of Rittinger's tank receives the deposit of gold cleared by the washing process—as the heavier substance and the sole product of value—and it remains there covered by the water in the tank until removed by the operator. For the purpose of such removal the drawing indicates a small opening (hole or pipe) in the wall of the tank at the foot of the incline, closed by a plug, so that both deposit and water must escape whenever the plug is manually taken out, either at the close of operations, or for clearance of the tank meanwhile. On the other hand, Stewart provides for the washed coal to escape laterally at the side of the jig, with the flow of water sent upwardly through the jig, making a continuous discharge of coal and water into tank $D$; and elevator $O$, provided in tank $D$, automatically conveys the washed coal to its pile, while the water overflows into pump tank $E$ and is returned through the circulating system for re-use in washing. The slate (and other refuse), as the heavier material of the "lively bed" of coal and slate in the jig, discharges therefrom below the coal and water discharge, to the inclined bottom of tank $C$, where a constant escape is provided by an opening into boot $F$ of the elevator, and perforated elevator $G$ automatically carries off the refuse thus deposited in tank $C$. This opening for escape of the slate is well differentiated from the above-mentioned hole and plug of Rittinger's device in this important feature: It intends and permits discharge of refuse through the opening, while the deposit is sufficient to close the opening against any considerable escape of water from the tank, when such escape would otherwise interfere with the circulating system of water above referred to. It is true, as stated in the argument of counsel, that "use of such bucket elevators for the removal of any desired material was an old expedient in the art"; but it is elementary, as well, that such fact is not controlling when the old means is introduced to make a new combination of elements, and that the test of invention is whether elements so united co-operate in a new way for the improved result. We are impressed with novelty in the above-mentioned conceptions of the patentee, as departures from prior devices, in securing automatic separation and conveyance of the coal and slate, together with constant automatic operation throughout the work and both conservation and circulation of the large water supply required for the operations. That the elevators respectively co-operate with all the other elements of the structure—do not serve as mere aggregations

for double use, as contended—we believe clearly appears from the foregoing references to their operation in connection with their intermediate co-operating means. From reception of mixed coal and slate at the jig all provisions of the structure are made co-operative in complete separation of the coal from the refuse.

We are of opinion, furthermore, that the elements of the patent claim are insufficiently stated in the above-mentioned contention of counsel, by way of showing anticipation thereof by Rittinger. While the invention (as before stated) is of narrow scope, it is well exemplified in the specifications and drawings, if not well expressed in the claim, and departures from Rittinger's disclosure plainly appear in these material features: (1) "Vertically reciprocating jig $H$" is provided with perforated bottom $J$, inclined to aid the discharge, together with two discharge openings at the side, one above (marked $K$) for discharging the coal and water (after the "jigging" process) into tank $D$, and the other below (marked $I$) for dropping the slate to the bottom of the jig tank. These provisions are integral parts of the jig, essential to its operation as specified, and no like provisions appear in form or function of Rittinger's jig. Both discharge openings must be treated as included in the claim of the jig "substantially as described." (2) In respect of tank $C$ of the patent, the opening provided at the foot of the inclined bottom (as heretofore mentioned) for constant passage of the slate to the elevator connection, while the water is retained in the tank for circulation, differentiates this tank from that of Rittinger in means and function. (3) The structures and arrangement of tanks $B$ and $C$, with the opening $Q$ and valve $R$ between them, are adjusted to provide a function through the operation of the jig, which neither appears nor is attainable in the form of the Rittinger means. Thus, with the various connections shown in specifications and drawings, not only are all means made co-operative for the process of separation, but the desirable system of water circulation plainly appears, constituting an important feature of the invention, not suggested by Rittinger. The objection urged on the part of the appellant, that this system of circulation "is not enumerated in the claim" of invention, is without force, as we believe, for the reason that all means therefor are well pointed out in specifications and drawings, and it is well settled that invention is to be claimed for the means united for the object sought, and not for their respective functions.

[2] The claim in suit does not name all the various means shown in the specifications and drawings for connection of the means or elements named therein to make them operative in the combination; but we believe the claim is, nevertheless, sufficient for enforcement, on reference to the specifications. It is to be interpreted to include such connections and relations of the several means of the combination which are named, as implied therewith to make them operative, in conformity with the specifications. Consolidated Roller Mill Co. v. Walker, 138 U. S. 124, 133, 11 Sup. Ct. 292, 34 L. Ed. 920; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 558, 18 Sup. Ct. 707, 42 L. Ed. 1136; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 432, 22 Sup. Ct. 698, 46 L. Ed. 968; American Fibre-

Chamois Co. v. Buckskin-Fibre Co., 72 Fed. 508, 515, 18 C. C. A. 662; Thompson-Houston Elec. Co. v. Black River Trac. Co., 135 Fed. 759, 765, 68 C. C. A. 461.

Other contentions, founded on the rulings of the Patent Office in the course of the application for the patent in suit, do not impress us to require discussion, and we are of opinion that the appellants are rightly charged for infringement of the patent.

The decree of the District Court accordingly is affirmed.